## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EXECWARE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-233-LPS |
| | ) | |
| BJ'S WHOLESALE CLUB, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| EXECWARE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-234-LPS |
| | ) | |
| BLUE NILE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| EXECWARE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-235-LPS |
| | ) | |
| BUY.COM INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| EXECWARE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 14-236-LPS |
| | ) | |
| DOLLAR GENERAL CORP., | ) | |
| | ) | |
| Defendant. | ) | |

EXECWARE, LLC,                              )
                                           )
                 Plaintiff,                )
                                           )
        v.                                 )          Civil Action No. 14-240-LPS
                                           )
NORDSTROM, INC.,                           )
                                           )
                 Defendant.                )
_____)

## REPORT AND RECOMMENDATION

Presently pending before the Court are motions to dismiss for failure to state a claim

under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motions"), filed by Defendants

BJ's Wholesale Club, Inc., Blue Nile, Inc., Buy.com Inc., Dollar General Corp., and Nordstrom,

Inc. (collectively, "Defendants"). (Civil Action No. 14-233-LPS, D.I. 8; Civil Action No. 14-

234-LPS, D.I. 8; Civil Action No. 14-235-LPS, D.I. 9; Civil Action No. 14-236-LPS, D.I. 9;

Civil Action No. 14-240-LPS, D.I. 8)[1] Defendants argue that Plaintiff Execware, LLC's

("Execware") United States Patent No. 6,216,139 (the "'139 patent") is directed to non-patent-

eligible subject matter pursuant to 35 U.S.C. § 101 ("Section 101"). (D.I. 9 at 1) For the reasons

that follow, the Court recommends that Defendants' Motions be DENIED.

## I.      BACKGROUND

### A.      Factual Background

The '139 patent is entitled "Integrated Dialog Box for Rapidly Altering Presentation of

Parametric Text Data Objects on a Computer Display[.]" It describes an invention meant to

---

[1]      Identical motions were filed in each of the above-captioned actions, and the
relevant briefing is identical in all of the actions. Future citations will be to the record in the
earliest-filed action, Civil Action No. 14-233-LPS, unless otherwise noted.

provide a user with the ability to rapidly format and re-format databases or "text data objects," according to the preferences of the user. ('139 Patent, at Abstract & cols. 1:6-11, 2:49-52)

According to the specification, database programs at the time of invention suffered from poor user interfaces, which were difficult and time consuming to use. (*Id.*, cols. 1:23-45; 2:6-20) These databases were designed by database operators, who were familiar with how databases work and, as such, were trained in how to manipulate the database and create tables that display the information in the database. (*Id.*, col. 1:23-45) But while database operators designed and constructed the databases, those databases were ultimately *used* for the most part by ordinary users, who were not familiar with how databases work, and who might find it difficult on their own to reformat or rearrange the tables that display the data. (*Id.*, cols. 1:23-45; 2:6-20) Thus, if a database user decided to reformat a view of information from the database, it might "take considerable time to produce a table reflecting the changes." (*Id.*, col. 1:40-42) "Even if the user is the operator of the database management system, time will be required and the user's current line of analytic reasoning may be lost." (*Id.*, col. 1:42-45) In other words, "while computer database management systems and spreadsheet programs with data-sorting capability ha[d] been widely available, existing systems and programs for sorting data may not [have] adequately serve[d] the needs of some users, especially those without specialized training or experience[.]" (*Id.*, col. 2:6-10) The patent specification identified the problem with the then-current interfaces used to search databases: existing programs required "a series of precisely-specified steps" in order to select different sort parameters and subsets of the data for viewing—steps that could "frustrate a user interested in quickly pursuing many varying lines of thought" and that often required "substantial training, familiarity with user manuals and, in some cases, specialized

3

personnel." (*Id.*, col. 2:14-20)

The patentee sought to solve this problem by designing a new user interface that would allow an ordinary user to "exercis[e] personal control of the format of the presentation" of the data. (*Id.*, col. 2:25-29) This new interface would allow regular users to quickly select and sort data from a database, without necessarily having to involve a more experienced database operator or other resources. (*Id.*, col. 2:29-65)

The patent contains three independent claims (claims 1, 10, and 19), all of which relate to the same subject matter. Claim 1 claims a method involving the use of a "query dialog box" to filter and sort data from a computer database:

> **1.** A method for using a computer system to sort and display text data objects, comprising the steps of:
> a. imaging, on a display device controlled by the computer system, a query dialog box,
>    wherein the query dialog box displays each of a plurality of parameters associated with each of the text data objects, forms a plurality of spaces for listing values associated with each displayed parameter, and further forms a space for selecting a sort order;
> b. designating, for each displayed parameter, a parameter value;
> c. constructing a sort order from the displayed parameters in the space for selecting a sort order;
> d. selecting, using the computer system, text data objects satisfying the designated values; and
> e. sorting, using the computer system, the selected text data objects according to the constructed sort order.

(*Id.*, col. 13:38-55) Claim 10 is a system claim with similar limitations, some of which are preceded with "means for." (*Id.*, col. 14:31-50) Claim 19 claims a computer program on a memory storage device that also performs similar functions. (*Id.*, col. 16:5-24)

Each of the eight claims that depend from claim 1 adds one or more steps to the method.

4

Claim 2 involves displaying the sorted list of text data objects that results from the query built in claim 1. (*Id.*, col. 13:56-58) Claim 3 relates to the process of editing existing database entries after they are displayed using the interface claimed in claims 1 and 2. (*Id.*, col. 13:59-65) The remainder of the claims that depend from claim 1 involve adding column headings to the sorted list (claim 4), adding new text data objects (claim 5), using multiple databases (claim 6), selecting one of multiple databases (claim 7), a dialog box for associating parameters with names and text data objects (claim 8), or the step of printing the sorted text data objects (claim 9). (*Id.*, cols. 13:66-14:30)

Dependent claims 11-18 depend from claim 10, and generally mirror dependent claims 2-9. (*Id.*, cols. 14:51-16:4) Independent claim 19 lacks any dependent claims.

## B. Procedural Background

Plaintiff commenced these actions on February 21, 2014. (D.I. 1) The Defendants filed the instant Motions in lieu of answering, and initial briefing was completed on the Motions on June 9, 2014. (Civil Action No. 14-235-LPS, D.I. 15)[2] Subsequent to Defendants' reply brief, Plaintiff filed a motion seeking permission to file a six-page sur-reply brief ("Plaintiff's Motion to File a Sur-Reply"), (D.I. 15), which Defendants opposed, (D.I. 17).[3] Defendants thereafter

---

[2]     The Court notes that Plaintiff's answering brief, (D.I. 10), lacks page numbers on all pages after page 1. The Court will therefore cite to this document by its CM/ECF page numbers.

[3]     The Court has reviewed Plaintiff's Motion to File a Sur-Reply and the relevant briefs, and has determined that the arguments offered in Defendants' reply brief were proper (and were not "new"), because they either expound on arguments made in Defendants' opening brief, or because they involve content that is directly responsive to arguments made in Plaintiff's answering brief. *See St. Clair Intellectual Prop. Consultants, Inc. v. Samsung Elecs. Co. Ltd.*, 291 F.R.D. 75, 80 (D. Del. 2013) ("A Court may grant leave to file a sur-reply if it responds to new evidence, facts, or arguments.") Thus, the Court hereby DENIES Plaintiff's Motion to File

submitted a notice of supplemental authority, and Plaintiff submitted a response to that notice. (D.I. 18, 20)[4]

The motion in Civil Action No. 14-235-LPS was referred to the Court for resolution by Chief Judge Leonard P. Stark on May 28, 2014, and the other motions in the remaining cases were referred on October 15, 2014. The Court thereafter held oral argument on December 10, 2014. (D.I. 23 (hereinafter, "Tr."))

## II. STANDARD OF REVIEW

### A. Standard of Review Regarding Motions to Dismiss Relating to Section 101 Issues

Pursuant to Rule 12(b)(6), a party may move to dismiss the plaintiff's complaint based on the failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The sufficiency of pleadings for non-fraud cases is governed by Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). In order to survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). In assessing the plausibility of a claim, the court must "construe the complaint in the light most favorable to the plaintiff, and determine whether, under

_____

a Sur-Reply.

[4]    These filings are in violation of District of Delaware Local Rule 7.1.2(b), because they go beyond the "citation of subsequent authorities[,]" and instead include argument akin to what would be found in a brief. Though the Court will take into account relevant court decisions issued subsequent to the briefing in this case, the Court will not otherwise consider the content of these notices.

any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

Here, the Motions filed pursuant to Rule 12(b)(6) are used to assert an affirmative defense. In that scenario, dismissal is permitted only if the well-pleaded factual allegations in the Complaint, construed in the light most favorable to the plaintiff, suffice to establish the defense. *See Jones v. Bock*, 549 U.S. 199, 215 (2007); *Kabbaj v. Google, Inc.*, Civ. No. 13-1522-RGA, 2014 WL 1369864, at *2 n.2 (D. Del. Apr. 7, 2014); *see also Genetic Techs. Ltd. v. Agilent Techs., Inc.*, 24 F. Supp. 3d 922, 927 (N.D. Cal. Mar. 7, 2014).

Patentability under Section 101 is a "threshold inquiry" and a question of law. *In re Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008), *aff'd, Bilski v. Kappos*, 561 U.S. 593 (2010). Yet this question of law is also one that "may be informed by subsidiary factual issues[.]" *CyberFone Sys., LLC v. Cellco P'ship*, 885 F. Supp. 2d 710, 715 (D. Del. 2012) (citing *In re Comiskey*, 554 F.3d 967, 976 (Fed. Cir. 2009)).[5] Some members of the United States Court of Appeals for the Federal Circuit have suggested that "any attack on an issued patent based on a challenge to the eligibility of the subject matter must be proven by clear and convincing evidence[,]" *CLS Bank Int'l v. Alice Co. Pty. Ltd.*, 717 F.3d 1269, 1304-05 (Fed. Cir. 2013)

---

[5]     In its answering brief, Plaintiff relies repeatedly on the Federal Circuit's opinion in *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335 (Fed. Cir. 2013) ("*Ultramercial II*"). (D.I. 10 at 4, 7, 9, 12) That opinion has since been vacated, and the Federal Circuit's subsequent opinion in the case reversed its prior decision in *Ultramercial II*. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 709-12 (Fed. Cir. 2014), *cert. denied sub nom., Ultramercial, LLC v. WildTangent, Inc.*, — S.Ct. —, No. 14-1392, 2015 WL 2457913 (U.S. June 29, 2015). As such, *Ultramercial II* lacks precedential effect, and the Court will not consider it here. *See TriPlay, Inc. v. WhatsApp Inc.*, Civil Action No. 13-1703-LPS, 2015 WL 1927696, at *4 n.3 (D. Del. Apr. 28, 2015) (describing the differences between these *Ultramercial* decisions).

(Rader, J., concurring-in-part and dissenting-in-part), but at least one other member of that Court has come to the opposite conclusion, *see Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 720-21 (Fed. Cir. 2014) ("*Ultramercial III*") (Mayer, J., concurring), all of which has led to some uncertainty regarding the appropriate standard of proof in Section 101 cases, *see Intellectual Ventures I LLC v. Symantec Corp.*, C.A. No. 10-1067-LPS, C.A. No. 12-1581-LPS, 2015 WL 1843528, at *5-6 (D. Del. Apr. 22, 2015) (citing cases). However, even to the extent that the "clear and convincing" standard of proof is applicable to Section 101 challenges, it would apply only to the resolution of factual disputes, and not to resolution of pure issues of law. *See TriPlay, Inc. v. WhatsApp Inc.*, Civil Action No. 13-1703-LPS, 2015 WL 1927696, at *3-5 (D. Del. Apr. 28, 2015) (citing cases); *see also Affinity Labs of Texas, LLC v. Amazon.com, Inc.*, No. 6:15-CV-0029-WSS-JCM, 2015 WL 3757497, at *5 (W.D. Tex. June 12, 2015). And as to the instant Motions, filed at the pleading stage (a stage at which, if there are disputed issues of fact, such facts are already to be construed in the light most favorable to the plaintiff), the "clear and convincing" standard of proof should not come into play at all. *See Triplay*, 2015 WL 1927696 at *5 n.5 (citing *Modern Telecom Sys. LLC v. Earthlink, Inc.*, No. SA CV 14-0347-DOC, 2015 WL 1239992, at *7-8 (C.D. Cal. Mar. 17, 2015)); *Shortridge v. Found. Constr. Payroll Serv., LLC*, Case No. 14-cv-04850-JCS, 2015 WL 1739256, at *7 (N.D. Cal. Apr. 14, 2015) (quoting *Modern Telecom*, 2015 WL 1239992 at *7-8).

## B. Need for Claim Construction

There is no hard-and-fast rule that a court must construe terms in the claims at issue before it performs a Section 101 analysis. *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion

8

that claim construction is not an inviolable prerequisite to a validity determination under [Section] 101.") In some cases, claim construction is unnecessary. *See, e.g., Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992-93, 992 n.1 (Fed. Cir. 2014) (holding that a patent claim was subject matter ineligible under Section 101, where the district court did not engage in claim construction, and where the plaintiff "d[id] not explain which terms require construction or how the analysis would change"). In other cases, such as when a Section 101 motion would be well taken even were a plaintiff's proposed claim construction to be accepted, a court may adopt the plaintiff's construction (or the construction most favorable to the plaintiff) for the purposes of the motion. *See Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) (concluding at the Rule 12(b)(6) stage that "even when construed in a manner most favorable to [plaintiff], none of [plaintiff's] claims amount to significantly more than the abstract idea [at issue]") (internal quotation marks and citations omitted); *Genetic Technologies Ltd. v. Lab. Corp. of Am. Holdings*, Civil Action No. 12-1736-LPS-CJB, 2014 WL 4379587, at \*5-6 (D. Del. Sept. 3, 2014) (citing cases). Alternatively, the Court may decline to rule on a Rule 12 motion prior to engaging in claim construction, *see, e.g., Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 834-35 (E.D. Tex. 2014) (Bryson, J., sitting by designation), or may deny the motion if it appears there are potential constructions of key claim terms that, if adopted, would render the claims subject matter eligible, *see TriPlay*, 2015 WL 1927696 at \*3-6, \*17-19.

## III. DISCUSSION

In resolving the Motions, the Court will first address Plaintiff's argument that patent eligibility under Section 101 cannot be properly addressed at this stage. (D.I. 10 at 4-6) The

Court will then go on to reach the substance of the Motions.

## A. Addressing Section 101 at the Rule 12(b)(6) Stage

Plaintiff puts forward two reasons why a Section 101-related affirmative defense cannot be properly addressed through the filing of a Rule 12(b)(6) motion to dismiss. The Court finds neither argument well taken.

First, Plaintiff argues that the "Supreme Court [of the United States] has expressly held that affirmative defenses [like the Section 101 defense at issue here] are not appropriate for motions to dismiss." (D.I. 10 at 5-6) The only precedent that Plaintiff cites in support of this assertion is the decision in *Mumm v. Jacob E. Decker & Sons*, 301 U.S. 168 (1937). (D.I. 10 at 6) Yet *Mumm* does not do the work Plaintiff asks of it.

In *Mumm*, the Supreme Court held that a plaintiff was not required to preempt potential affirmative defenses in its own pleading by setting forth facts establishing that the patent at issue was valid under the statutory requirements of the time.[6] *Mumm*, 301 U.S. at 169-71. Instead, the *Mumm* Court noted that it is the defendant's burden to present facts with regard to validity, and "[w]hat must be . . . established by the defendant cannot be regarded as a part of the plaintiff's case which is to be set forth in his bill[.]" *Id.* at 171. Although *Mumm* thus held that the plaintiff was not required to "negative" any affirmative defenses at issue by way of the facts pled in its

---

[6]     As set forth in *Mumm*, these requirements included "that the invention, of each of the patents in suit, was not known or used by others in this country before the inventor's invention or discovery thereof, was not patented or described in any printed publication in this or any foreign country before his invention or discovery, or for more than two years prior to his application, and was not in public use or on sale in this country for more than two years prior to his application, that the invention had not been abandoned, and that no application for foreign patents had been filed more than twelve months prior to the filing of the application in this country." *Mumm*, 301 U.S. at 169.

complaint, *id.* at 171, the *Mumm* Court did not foreclose the possibility that the legal merit of

certain affirmative defenses (such as, here, patent ineligibility) could well be evident solely via

an examination of what *has* been alleged in a complaint (and via the exhibits attached thereto,

which here includes the patent-in-suit), (D.I. 1 & ex. A). And, as was noted above in Section

II.A, since *Mumm*, the Supreme Court, lower courts, and legal commentators have routinely

stated that affirmative defenses may in fact be adjudicated at the pleading stage—so long as the

applicability of the affirmative defense is clear from the face of the complaint, documents

integral to it, and exhibits attached thereto.[7] Indeed, the Federal Circuit has recently (and

repeatedly) adjudicated Section 101 affirmative defenses that were raised via a Rule 12(b)(6)

motion. *See, e.g., Ultramercial III*, 772 F.3d at 711, 717; *Content Extraction*, 776 F.3d at 1349;

*see also OIP Techs., Inc. v. Amazon.com, Inc.*, — F. 3d —, No. 2012–1696, 2015 WL 3622181,

at *4 (Fed. Cir. June 11, 2015) (Mayer, J., concurring) (commending the lower court for

resolving a Section 101 affirmative defense at its first opportunity, and stating that "where . . .

asserted claims are plainly directed to a patent ineligible abstract idea, we have repeatedly

sanctioned a district court's decision to dispose of them on the pleadings"). For all of these

reasons, *Mumm* does not prevent the Court from taking up Defendants' Motions at this time.

Plaintiff's second argument also fails. Here, Plaintiff asserts that: (1) in its Complaint, it

pled that the '139 patent was "duly and legally issued by the Patent Office"; (2) that "fact must be

---

[7]     *See Jones*, 549 U.S. at 215 ("Whether a particular ground for opposing a claim
may be the basis for dismissal for failure to state a claim depends on whether the allegations in
the complaint suffice to establish that ground, not on the nature of the ground in the abstract.");
5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed.
2015) ("As the case law makes clear, the complaint also is subject to dismissal under Rule
12(b)(6) when its allegations indicate the existence of an affirmative defense that will bar the
award of any remedy . . .").

assumed to be true" at the pleading stage, and it "gives rise to a legal presumption that the patent-in-suit is valid"; and (3) this presumption of validity precludes a determination at this stage that the patent is subject matter ineligible. (D.I. 10 at 6; *see also* D.I. 1 at ¶ 6)

The Court disagrees with the premises behind Plaintiff's argument, for a number of different reasons. First, Plaintiff's statement that its patent was "duly and legally" issued (to the extent that this amounts to an assertion that the patent is subject-matter eligible) is a textbook example of a bare legal conclusion, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Second, assuming that the presumption of validity applies in the context of a Section 101 eligibility challenge, it is the wording of 35 U.S.C. § 282 that would give rise to the presumption, not whether or not Plaintiff invoked any particular "magic words" in its Complaint. *Cf. Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2242-43 (2011). And third, the effect of the presumption of validity is to impose the burden of proving invalidity on the party attacking validity, and to implicate a heightened standard of proof (the "clear and convincing" evidence standard) with regard to the resolution of factual disputes that relate to the question of validity. *See i4i*, 131 S. Ct. at 2243-52; *see also id.* at 2253 (Breyer, J., concurring). In the context of these Motions, which are being considered at the Rule 12(b)(6) stage, the fact that the movant bears the burden of proof on an affirmative defense does not preclude a finding of ineligibility. And (as was noted above), the "clear and convincing" standard of proof does not come into play at all.

Because the Court has determined that it can be proper to address a Section 101 motion in a patent infringement action at the Rule 12(b)(6) stage, the Court now proceeds to assess the

12

substance of Defendants' Motions.

**B.     Patentable Subject Matter**

Patent-eligible subject matter is defined in Section 101 of the Patent Act:

> Whoever invents or discovers any new and useful process, machine,
> manufacture, or composition of matter, or any new and useful
> improvement thereof, may obtain a patent therefor, subject to the
> conditions and requirements of this title.

35 U.S.C. § 101. In choosing such expansive terms "modified by the comprehensive 'any,'

Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v.*

*Chakrabarty*, 447 U.S. 303, 308 (1980).

Yet while the scope of Section 101 is broad, there is an "important implicit exception [to

it]: [l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty.*

*Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks and citation

omitted); *see also Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293

(2012). "Phenomena of nature, though just discovered, mental processes, and abstract

intellectual concepts are not patentable, [because] they are the basic tools of scientific and

technological work." *Prometheus*, 132 S. Ct. at 1293 (quoting *Gottschalk v. Benson*, 409 U.S.

63, 67 (1972)).

The Supreme Court has also recognized, however, that "too broad an interpretation of this

exclusionary principle could eviscerate patent law." *Id.*; *see also Alice*, 134 S. Ct. at 2354. This

is because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature,

natural phenomena, or abstract ideas." *Prometheus*, 132 S. Ct. at 1293; *see also Alice*, 134 S. Ct.

at 2354. To that end, it has explained that "an *application* of a law of nature, [natural phenomena

13

or abstract idea] to a known structure or process may well be deserving of patent protection." *Diamond v. Diehr*, 450 U.S. 175, 187 (1981) (emphasis in original).

In terms of the process used to analyze patent eligibility under Section 101, the Federal Circuit has explained that a court should first identify whether the claimed invention fits within one of the four statutory classes set out in the statute: processes, machines, manufactures, and compositions of matter. *Ultramercial III*, 772 F.3d at 713-14. The court must then assess whether any of the judicially recognizable exceptions to subject matter eligibility apply, including whether the claims are to patent-ineligible abstract ideas. *Ultramercial III*, 772 F.3d at 714.[8]

In *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347, 2354 (2014), the Supreme Court confirmed the framework to be used in order to distinguish patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. . . . If so, we then ask, "[w]hat else is there in the claims before us?" . . . To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application. . . . We have described step two of this analysis as a search for an "'inventive concept'"—*i.e.*, an element or combination of elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Alice*, 134 S. Ct. at 2355 (quoting *Prometheus*, 132 S. Ct. at 1294-98) (citations omitted;

---

[8]     There is no dispute in this action that the claims at issue fall into one of the applicable statutory classes. The dispute here is about whether the claims are drawn to a patent-ineligible abstract idea, and so the Court will focus its analysis on that issue.

alterations in original); *see also Parker v. Flook*, 437 U.S. 584, 594 (1978). Since *Alice*, the Federal Circuit has recognized that "[d]istinguishing between claims that recite a patent-eligible invention and claims that add too little to a patent-ineligible abstract concept can be difficult, as the line separating the two is not always clear." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).

### C.    Claim 1

The Court will first examine claim 1 of the '139 patent, which Defendants assert is representative of all of the independent claims. (D.I. 9 at 4-5; D.I. 13 at 9-10) Claim 1 involves a computer interface that allows a user to build a query that will be used to search for and retrieve certain "text data objects" out of a set of such objects (e.g., a database or a spreadsheet). (*See, e.g.*, '139 patent, cols. 2:21-24, 7:25-40; 13:38-54) Construed in the light most favorable to Plaintiff,[9] claim 1 sets forth a method involving: (1) displaying the interface by "imaging" it on a display (step a); (2) the use of the interface by "designating" values for search parameters and "constructing" a sort order for the results (steps b and c), and (3) the computer's process of "selecting" text data objects that match the values (i.e., executing the search) and then "sorting" them to match the sort order (steps d and e). (*Id.*)

In step a of claim 1 (the "imaging" step), the claim refers to a "query dialog box" that appears on the display. (*Id.*, claim 1) As described in the specification, a "query dialog box" is an interface element in a personal computer. (*See id.*, Fig. 3; *id.*, cols. 3:62-64, 5:55-6:29)

---

[9]     For purposes of assessing the Motions, the Court will presume that the claims are to be construed in the manner most favorable to Plaintiff. *See Content Extraction*, 776 F.3d at 1349. To the extent that the Court attributes meaning to certain claim terms herein, it does so in this spirit, and is not intending to definitively construe any term (something that would occur after a *Markman* hearing).

Figure 3 of the '139 Patent shows an example embodiment, in which the query dialog box is designated as item 300:



**Fig. 3**

(*See id.*, col. 5:57)

As described in the claim, the query dialog box has two primary characteristics. First, it contains an area for a user to enter values for a search query of a database: "the query dialog box displays each of a plurality of parameters associated with each of the text data objects [and] forms a plurality of spaces for listing values associated with each displayed parameter[.]" (*Id.*, col. 13:42-45) In the example embodiment, this area is designated the "Build Query dialog box (**302**)[,]" and appears on the left-hand side of Figure 3. (*Id.*, col. 5:61-65) This dialog box displays "parameters" that correspond to column headings in a table of text data objects. (*Id.*, cols. 2:54-61, 4:4-6, 8:17-20) Figure 4 shows a table used in the embodiment, which includes these column headings:



**Fig. 4**

(*Id.*, col. 4:4-6) For example, the column heading "Assigned To" appears in the center of Figures 3 and 4; below it, in Figure 3, a pull-down menu allows a user to select the name of an assignee to be used in the query. (*See id.*, cols. 6:15-39, 7:24-31, Fig. 3(b) (showing a query for all tasks assigned to "Johnson"))

The second characteristic of the query dialog box is that it includes a space for the user to select a sort order for the data returned by the query: "the query dialog box . . . forms a space for selecting a sort order[.]" (*Id.*, col. 13:42-46) In the embodiment shown by Figure 3, this is displayed on the right hand side as the "Sort Order dialog box (**312**)"; the parameter named "Issue" is checked and the designation "(1)" appears beside it, meaning that the results of the query will be sorted first by that parameter. (*Id.*, col. 6:40-60) If an additional box were

17

checked, such as the box next to "Due Date[,]" a "(2)" would appear beside that box, and the results of the search query would be sorted first by "Issue" and then by "Due Date[.]" (*Id.*, cols. 6:53-7:8)

The remaining steps of Claim 1, including steps b-e, encompass operations following the display of the query dialog box, including the user's act of designating values for the search parameters, the user's act of constructing the sort order, and the computer's task of actually performing the query and sorting the results. The final outcome is a sorted list of text data objects that were selected by the computer using the query constructed in the query dialog box. (*Id.*, claim 1) An example of such a list is shown in Figure 4(a), which reflects a query where the "Assigned To" parameter was specified as "Johnson":



Fig. 4 (a)

('139 Patent, col. 4:7-10)[10]

---

[10]   Note that claim 1 does not on its face claim as a step the actual *display* of the sorted list as shown in Figure 4(a); that step is reserved for dependent claim 2. The method set forth in claim 1 stops at step e, in which the results of the query are sorted by the computer prior

In short, claim 1 describes a user interface that allows a user to construct a query to search a database or other collection of text-based information.

## D.     *Alice* Step One as Applied to Claim 1

Defendants assert, pursuant to step one of the *Alice* framework, that claim 1 is directed to the "well-known concept of displaying, classifying, and organizing unspecified information (referred to as text data objects) in an unspecified transaction."[11] (D.I. 9 at 3; *see also id.* at 1 (asserting that "the claims of the '139 patent relate to the purely abstract idea of displaying, classifying and organizing information")) In their opening brief, Defendants provided a highlighted version of claim 1, which describes step a as directed to the abstract idea of "displaying data," steps b and c as directed to the abstract idea of "classifying data," and steps d and e as directed to "sorting and organizing data." (D.I. 9 at 3)

_____

to any display.

[11]     Defendants here have articulated the alleged abstract idea in several different ways—a not uncommon problem in relation to Section 101 motions. (*Compare* D.I. 9 at 2 (characterizing the claims as directed to "the claimed abstract concept of categorical data storage and organization"), *id.* at 3-4 (characterizing claim 1 as being directed towards three abstract ideas, including "displaying data," "classifying data," and "sorting or organizing data"), and D.I. 13 at 9 (describing a singular abstract idea of "'displaying,' 'classifying,' and 'sorting' data") *with* Tr. at 19 (describing the abstract idea as "rapidly sort[ing] and format[ting] the display of tabular information")); *see also DDR Holdings, LLC*, 773 F.3d at 1257 (noting defendants' "varying formulations of the underlying abstract idea"); *TriPlay*, 2015 WL 1927696, at *8 n.8 (noting that the defendant had proposed numerous formulations of the alleged abstract idea in its briefing related to a Section 101 motion). A movant's inability to clearly and uniformly articulate the asserted abstract idea in question can make the *Alice* analysis difficult for the Court, and can suggest weakness in the movant's overall position. *Cf. DDR Holdings, LLC*, 773 F.3d at 1257. Here, the Court will apply the articulation of the abstract idea described in the text above, which is set forth in the beginning of Defendants' opening brief. That articulation appears to be the formulation that Defendants have put front and center here. The Court also notes that its conclusions would remain unchanged were it to take into account any of Defendants' other proposed formulations of the abstract idea.

The Federal Circuit has applied step one of the *Alice* test in a number of recent cases. In analyzing claim 1 of the '139 patent, the Court will utilize the methods of analysis undertaken by the Federal Circuit in a few of those recent cases.

### 1. *Ultramercial III*

In its opinion in *Ultramercial III*, the Federal Circuit dealt with claims relating to "a method for distributing copyrighted media products over the Internet where the consumer receives a copyrighted media product at no cost in exchange for viewing an advertisement, and the advertiser pays for the copyrighted content." *Ultramercial III*, 772 F.3d at 712. The representative claim at issue involved eleven steps, which the Federal Circuit characterized as follows:

> (1) receiving copyrighted media from a content provider; (2) selecting an ad after consulting an activity log to determine whether the ad has been played less than a certain number of times; (3) offering the media for sale on the Internet; (4) restricting public access to the media; (5) offering the media to the consumer in exchange for watching the selected ad; (6) receiving a request to view the ad from the consumer; (7) facilitating display of the ad; (8) allowing the consumer access to the media; (9) allowing the consumer access to the media if the ad is interactive; (10) updating the activity log; and (11) receiving payment from the sponsor of the ad.

*Id.* at 714-15.

The Court determined that these claimed steps "recite[] an abstraction—an idea, having no particular concrete or tangible form[,]" and that the claim was ultimately directed to an abstract idea:

> The process of receiving copyrighted media, selecting an ad, offering the media in exchange for watching the selected ad, displaying the ad, allowing the consumer access to the media, and

20

> receiving payment from the sponsor of the ad all describe an
> abstract idea, devoid of a concrete or tangible application.

*Id.* at 715. In coming to this conclusion, the Federal Circuit looked to the claim as a whole, and

found that "[a]lthough certain additional limitations, such as consulting an activity log, add a

degree of particularity, the concept embodied by the *majority of the limitations* describes only the

abstract idea of showing an advertisement before delivering free content." *Id.* (emphasis added);

*see Hewlett Packard Co. v. ServiceNow, Inc.*, Case No. 14-cv-00570-BLF, 2015 WL 1133244, at

\*5-6 (N.D. Cal. Mar. 10, 2015) (applying the "majority of the limitations" language from

*Ultramercial III* to analyze whether a claim was directed to an abstract idea).

Here, the Court cannot conclude that the "majority of the limitations" in claim 1 are

directed to the asserted abstract idea of "displaying, classifying, and organizing unspecified

information (referred to as text data objects) in an unspecified transaction." (D.I. 9 at 3) More

particularly, the Court simply disagrees with Defendants' characterizations as to how the asserted

abstract idea jibes with the actual language used in steps a-d.

For example, Defendants assert that step a is directed[12] to "displaying data"—i.e., "text

data objects[.]"[13] (D.I. 9 at 3) But step a involves displaying only a particular user interface for

interacting with a computer. No "text data objects" need be displayed in this step, and the only

---

[12]     With regard to the first step of the *Alice* test, Defendants at times assert that
certain claim language is "related to" the abstract idea, and at times refer to whether the language
is "directed . . . toward" or "directed at" that abstract idea. (D.I. 9 at 3-4) Because the proper
question is whether the claims are "directed to" an abstract idea, the Court will apply that
language. *Alice*, 134 S. Ct. at 2355.

[13]     The "data" at issue in the claim, and in Defendants' characterization of the alleged
abstract idea, are "text data objects." (D.I. 9 at 3-4; *see also* '139 patent, claim 1 (claiming a
"method for using a computer system to sort and display *text data objects*") (emphasis added))

21

"data" that must be displayed is the interface itself. Step a is not directed to "displaying data."

Defendants next assert that steps b and c are directed to "classifying data" such as "text data objects[.]" (*Id.* at 3-4) But construed in the light most favorable to Plaintiff, step b is directed to only the user's act of entering in parameters for a search query. For instance, following the example set forth in Figure 3, a user might enter the name "Johnson" into the "Assigned To" field. In that operation, the text data objects are not being "classified" in any meaningful sense; instead, the user is using the form to create a query that will be used to return only certain information from a database. ('139 patent, col. 6:24-31) The data itself remains unchanged, and at this stage of the claim no query has yet been made to retrieve or sort the data based on the specified parameters. Thus, step b is not directed towards "classifying" data. Nor is step c, construed in the manner most favorable to Plaintiff. Instead, step c is directed to the use of the "space for selecting a sort order" in the query dialog box to select a sort order (such as choosing to sort results by "Issue"). (*See id.*, col. 6:40-7:8; Fig. 3) That sort order is not actually applied until step e of the claim.

Finally, absent completion of the claim construction process, the Court cannot conclude that step d of the claim is directed to "sorting and organizing data" as asserted by Defendants. (D.I. 9 at 4) Instead, as described in the claim, it appears that the computer "select[s]" certain text data objects for display, based on the parameter values set by the user in step b. (*Id.*, col. 7:33-45) Viewed in the light most favorable to Plaintiff, nothing on the face of step d indicates that these objects are actually sorted or organized—they are "select[ed]" for the purpose of displaying search results, nothing more. (*See id.*, cols. 7:33-8:58 (describing, with regard to one embodiment, the process of selecting, sorting, and displaying text data objects in response to a

22

query, and then returning to the query dialog box))

All told, the only claim element that is clearly directed to the asserted abstract idea as defined by Defendants is step e, which involves sorting the selected text data objects for display. Thus, while Defendants argue that the asserted abstract idea permeates the claim, in fact only a small minority of the claim language can be fairly said to be directed to the abstract idea as articulated by Defendants.

### 2. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014)

Next, the Court notes that, unlike the claims held not to be patent eligible in *Ultramercial III*, the solution claimed in claim 1 has a "particular concrete or tangible form." *Ultramercial III*, 772 F.3d at 715. To underscore this conclusion, the Court finds it helpful to compare the claim to the key claim at issue in the Federal Circuit's recent decision in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).

In *DDR Holdings*, the Federal Circuit strongly implied that the claims of a patent relating to the handling of Internet hyperlinks in an online store were not directed to an abstract idea under step one[14] of the *Alice* test. *DDR Holdings*, 773 F.3d at 1256-59. The claims in *DDR*

---

[14]    District courts have disagreed as to whether *DDR Holdings* should be read as having concluded that the claim at issue there was not directed to an abstract idea under step one of *Alice*, or whether the decision was solely intended to convey that, pursuant to step two of *Alice*, the claim amounted to a patent-eligible application of an abstract idea. *Compare Affinity Labs of Texas, LLC v. DirecTV, LLC*, No. 6:15-CV-0030-WSS-JCM, 2015 WL 3764356, at *15 (W.D. Tex. June 2, 2015) (describing *DDR Holdings* as concluding that "that the patent at issue was probably not directed to an abstract idea") *and Jericho Sys. Corp. v. Axiomatics, Inc.*, Civil Action No. 3:14-CV-2281-K, 2015 WL 2165931, at *5 (N.D. Tex. May 7, 2015) (applying the decision in *DDR Holdings* as part of the court's *Alice* step one analysis), *with BASCOM Global Internet Servs., Inc. v. AT & T Mobility LLC*, — F.Supp.3d —, No. 3:14-cv-3942-M, 2015 WL 2341074, at *11 (N.D. Tex. May 15, 2015) (stating that "it should be noted that the Federal Circuit did not decide in *DDR Holdings* whether the composite web page at issue was directed toward an abstract idea" under step one of the *Alice* test). The Court has previously concluded

23

*Holdings* related to a "solution" to an "Internet-centric problem": "the problem of retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on an advertisement and activating a hyperlink." *Id.* at 1257-59. Once the visitor was transported away from the host's website, the host risked losing "control over the attention of the customer[.]" *Id.* at 1258. The claimed invention was intended to solve this problem by using a destination website that looks and feels like the host's own website:

> [A]sserted claim 19 recites a system that, among other things, 1) stores "visually perceptible elements" corresponding to numerous host websites in a database, with each of the host websites displaying at least one link associated with a product or service of a third-party merchant, 2) on activation of this link by a website visitor, automatically identifies the host, and 3) instructs an Internet web server of an "out-source provider" to construct and serve to the visitor a new, hybrid web page that merges content associated with the products of the third-party merchant with the stored "visually perceptible elements" from the identified host website.

*Id.* at 1257. The representative claim at issue in *DDR Holdings* included specific limitations implementing this system that resulted in the generation of these "new, hybrid web page[s]"—limitations relating to the content and ownership of the web pages at issue, and to the manner in which the computer server at issue received, stored and retrieved certain data relating to those web pages. *Id.* at 1249-50, 1257.

The *DDR Holdings* Court held that "these claims stand apart" from those in other recent Section 101 opinions, even though they too "involve both a computer and the Internet[,]"

---

that, at a minimum, the decision in *DDR Holdings* strongly implies that the claims at issue were not directed to an abstract idea. *See TriPlay*, 2015 WL 1927696, at *12 n.13.

24

because the claims "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *Id.* at 1257. It distinguished these claims from those at issue in *Ultramercial III* because the claims in *DDR Holdings* did "not broadly and generically claim 'use of the Internet' to perform an abstract business practice (with insignificant added activity)"; instead, they "specify how interactions with the Internet are manipulated to yield a desired result—a result that overrides the routine and conventional sequence of events ordinarily triggered by the click of a hyperlink." *Id.* at 1258. Thus, in *DDR Holdings*, the "claimed solution [was] necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *Id.* at 1257; *see also Essociate, Inc. v. Clickbooth.com, LLC*, No. SACV 13-01886-JVS (DFMx), 2015 WL 1428919, at *6 (C.D. Cal. Feb. 11, 2015).

Like the claims at issue in *DDR Holdings*, claim 1 of the '139 patent is not infused with language referencing a generic business practice that is unmoored from any particularized, concrete application. Instead, claim 1 references a specific "claimed solution" (the use of a query dialog box that has particular features) to an identified problem (that the design of a custom database query using the then-available software involved a time-consuming process, resort to which would distract a user from the user's line of thought). ('139 patent, cols. 1:32-45, 2:6-46; *see also* D.I. 10 at 13-14) And, as in *DDR Holdings*, this proffered solution is one "rooted in computer technology in order to overcome a problem specifically arising in the realm of computer[s.]" *DDR Holdings*, 773 F.3d at 1257. Claim 1's concrete solution changes the equation for the computer user: a query dialog box displays parameters from a table and contains a space for a user to build a query by listing values associated with those parameters, along with a

space for a user to select a sort order for the results of that query. ('139 patent, col. 13:42-46) According to the patent, this new interface replaces or supplements prior art query-building options, allowing even an inexperienced user to more easily and rapidly change the content of tables containing text data objects (e.g., a database) and to immediately see the results. (*See id.*, cols. 2:21-52, 8:59-64) When construed in the light most favorable to the patentee, this claim element sets forth a sufficiently articulated structure that solves a problem with the computers of the prior art, such that it is not directed to an abstract idea.[15]

Defendants contend that, unlike the patent at issue in *DDR Holdings*, "[t]he problem that the inventor faced here was not a problem of computers[,]" because "[g]raphical user interfaces already exist[ed]." (Tr. at 83-84) Instead, Defendants argue, the problem that the patentee faced was the need to "more rapidly sort and filter data[,]" an improvement the patentee referred to as "contextual data modeling[.]" (*Id.*) According to Defendants, this was "not a computer problem" but an "intellectual conceptual problem." (*Id.*)

The Court disagrees. The problem that the inventor faced and articulated in the patent was particular to the realm of computer database programs: the cumbersome user interfaces of prior art programs with regard to the task of building queries for a database. In an attempt to solve that problem, the patentee purported to invent an improved user interface, which he hoped would allow users to interact with computer databases more efficiently and effectively. With this increased interactivity, the patentee aspired to enable users to better understand the relationships between data in the computer database—i.e., to engage in contextual data modeling. ('139

---

[15]      One can contrast the query dialog box as claimed with a hypothetical, less concrete version, which might consist of "imaging, on a display device, an interface for inputting parameter values and a search order."

patent, col. 1:15-2:46) But claim 1 does not claim the process of contextual data modeling itself. It claims a particular, improved computer interface (the query dialog box) that would permit a user to make use of contextual data modeling.[16] *Cf. Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 868-69 (Fed. Cir. 2010) (finding that patents claiming methods for rendering a halftone image of a digital image by comparing, pixel by pixel, the digital image against a blue noise mask were subject matter eligible, and that "inventions with specific applications or improvements to technologies in the marketplace are not likely to be so abstract that they override the statutory language and framework of the Patent Act").[17]

### 3. *Internet Patents Corp. v. Active Network, Inc.*, — F. 3d —, No. 2014-1048, 2015 WL 3852975 (Fed. Cir. June 23, 2015)

---

[16]   Although Defendants describe the idea of "contextual data modeling" as entirely divorced from the realm of computers, (Tr. at 83-84), that is not the way that the term is used in the patent specification. To the contrary, the specification discusses the concept of "contextual data modeling" in the context of a discussion regarding "currently-available database management systems and spreadsheet programs" for computers, and the problems that existed with those systems and programs. (*Id.*, col. 2:21-46) The patent describes the problem with then-current computers as being that database users needed additional "interactive capabilities" so that they could "[p]erceiv[e] . . . relationships [between data objects] rapidly, and in the context of other data and analytic intentions in the user's mind[.]" ('139 patent, col. 2:43-46) This goal of understanding the relationships between objects is referred in the patent as "contextual data modeling"—but that concept is relevant to the patent only in relation to "the analysis of individual text data objects as well as entire databases of text data objects" and how that analysis can be "enhanced." (*Id.*, col. 2:34-46)

[17]   At oral argument, Defendants' counsel attempted to distinguish the decision in *DDR Holdings* in the following way: "[t]he invention in *DDR Holdings*, what the Court held was that's a technological problem in a particular technological environment and other people have been trying to solve it; however, [the patentee was] going to improve that technology, the internet and commerce on the internet by taking a different approach[.]" (Tr. at 40 (emphasis added)) But claim 1 can plausibly be read as fitting just that same bill. The patentee "improve[d]" the then-existing programs for the sorting and display of computer databases or tables by taking a different approach, and describing a method that used a specific interface purporting to be different from other interfaces that were in use at the time.

27

Finally, the Court also finds support for its conclusion regarding step one in the recent

Federal Circuit decision of *Internet Patents Corp. v. Active Network, Inc.*, — F. 3d —, No. 2014-

1048, 2015 WL 3852975 (Fed. Cir. June 23, 2015). There, in articulating the nature of its

inquiry under *Alice*'s step one, the Federal Circuit used the patent specification's description of

the invention to "ascertain[] the basic character of the subject matter" of the patent. *Internet*

*Patents,* 2015 WL 3852975 at *4-6. The *Internet Patents* Court identified "the character of the

claimed invention" as "the idea of retaining information in the navigation of online forms[,]" due

to a statement in the specification that "[t]he most important aspect of . . . the present invention is

. . . that it maintains data state across all [browser] panes [containing data inputted by a user]."

*Id.* at *4-5 (citation omitted). The Court thereafter concluded, without further analysis, that "the

character of the claimed invention is an abstract idea:  the idea of retaining information in the

navigation of online forms." *Id.*[18]

Applying this approach to step one here, the Court finds that the '139 patent specification

is similarly helpful, in that it indicates that step a is the "most important aspect" of claim 1. The

specification takes pains to explain that the databases and spreadsheets were already practiced in

the prior art, but that the methods available for users to interact with these databases and

spreadsheets were flawed. ('139 patent, cols. 1:15-2:46) The specification goes on to describe

---

[18]    In some ways, the *Alice* step one analysis used in *Internet Patents* seems to differ
from that used in *Ultramercial III*. For example, at step one, the *Internet Patents* Court seemed
to ignore the portions of the claim that existed in the prior art and focus only on the portions that
were asserted to be the "most important aspect" of the invention; after doing so, it then
considered whether that portion of the claim was directed to an abstract idea. *See Internet*
*Patents*, 2015 WL 3852975 at *4-5. This seems to be a different approach from assessing
whether the "majority of the limitations" in the entire claim-at-issue "recites an
abstraction"—i.e., the approach described in *Ultramercial III*. *Ultramercial III*, 772 F.3d at 715.

the core of the invention as follows: "[t]he present invention permits the use of a computer system rapidly to reformat displays of text data objects in terms of parameters chosen by the user, without the aid of an instruction manual and without extensive computer training." (*Id.*, col. 2:49-52) This statement demonstrates that the "most important aspect" of the invention is not the alleged abstract idea of "displaying, classifying, and organizing unspecified information" generally, which was practiced in the prior art. Instead, it is the creation of an *improved user interface* for more easily interacting with database and spreadsheet programs on a computer, which is embodied by step a of claim 1. And, for the reasons described above, the description of that interface in the claim, read in the light most favorable to Plaintiff, contains sufficient particularity such that it is not directed to an abstraction.

### 4. Conclusion

Under any of the forms of analysis set out above, claim 1 is not directed to an abstract idea.

### E. *Alice* Step Two as Applied to Claim 1

Having determined that claim 1 is not directed to an abstract idea under varying formulations of step one of the *Alice* test, the Court could end its analysis. Because the law in this area is still evolving, however, the Court will also address step two of the *Alice* test. That is, the Court will assess whether, assuming *arguendo* that (as Defendants assert) claim 1 is in fact directed to the abstract idea of "displaying, classifying, and organizing unspecified information (referred to as text data objects) in an unspecified transaction[,]" (D.I. 9 at 3), the claim nevertheless contains sufficient additional elements to transform it into a patent-eligible application of the abstract idea.

29

### 1. Claim 1 Contains an Inventive Concept

Step two of the *Alice* framework asks whether the claims contain an "inventive concept," meaning "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S.Ct. at 2355 (internal quotation marks and citation omitted). The additional elements within the claim, apart from the abstract idea itself, must involve more than "'well-understood, routine, conventional activit[ies]' previously known to the industry." *Alice*, 134 S.Ct. at 2359 (quoting *Prometheus*, 132 S. Ct. at 1294); *see also Prometheus*, 132 S. Ct. at 1300 ("[S]imply appending conventional steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable."). The purpose of the "inventive concept" requirement is to "ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Alice*, 134 S. Ct. at 2357 (internal quotation marks, citation, and brackets omitted). Neither "limiting the use of an abstract idea to a particular technological environment[,]" nor simply stating an abstract idea and adding the words "apply it[,]" will transform an abstract idea into a patent-eligible invention. *Alice*, 134 S. Ct. at 2358 (internal quotation marks and citations omitted).

The Court concludes that the presence of the query dialog box limitation in claim 1 of the '139 patent amounts to the inclusion of an inventive concept, as it is a meaningful limitation on the underlying idea of "displaying, classifying, and organizing unspecified information (referred to as text data objects) in an unspecified transaction." (D.I. 9 at 3) As set forth above, this interface is described with particularity. From these articulated limitations, it is possible to determine what constitutes a query dialog box and what does not. Moreover, the specification

30

suggests that the query dialog box was intended to represent a specific departure from the way in which this task was performed in the prior art. ('139 patent at Abstract & cols. 1:32-45, 2:6-46) This shows that claim 1 does not "broadly and generically claim use of [a computer] to perform" the abstract idea. *DDR Holdings*, 773 F.3d at 1258. Instead, it "specif[ies] how interactions with the [computer] are manipulated to yield a desired result" by describing a particular interface to be used on a computer, and how certain aspects of that interface are used to improve the functioning of the computer—by allowing the user to interact with the computer in a more efficient way. *Id.*; *cf. Internet Patents*, 2015 WL 3852975 at *5 (holding that a claim did not disclose an inventive concept because it "contain[ed] no restriction on *how* the result is accomplished. The mechanism for [applying the abstract idea] is not described, although this is stated to be the essential innovation.") (emphasis added). This makes clear that claim 1 is "more than a drafting effort designed to monopolize the abstract idea itself." *Alice*, 134 S. Ct. at 2357 (internal quotation marks, brackets, and citation omitted).

In arguing to the contrary that the claim fails step two of the *Alice* test, Defendants make several arguments. The Court will address each briefly.[19]

---

[19] In addition to the arguments discussed below, Defendants also raised arguments regarding the machine-or-transformation test, to which Plaintiff responded. (D.I. 9 at 14-19; D.I. 10 at 10-12; D.I. 13 at 6-8; Tr. at 36-37) The Court does not find resort to the machine-or-transformation test to be particularly helpful under these circumstances, where the objective of the patent is to improve the function of computer software. *See DDR Holdings*, 773 F.3d at 1258-59 (addressing a claim that is similar in some ways to claim 1 of the '139 patent, and holding that it was patent eligible, without applying the machine-or-transformation test, after questioning the test's helpfulness as to evaluation of claims involving computer-related limitations); *cf. Ultramercial III*, 772 F.3d at 717 (noting that the test "is not conclusive"); *TQP Dev., LLC v. Intuit Inc.*, CASE No. 2:12-CV-180-WCB, 2014 WL 651935, at *5-7 (E.D. Tex. Feb. 19, 2014) (Bryson, J., sitting by designation) (holding that a claim that did not appear to meet either prong of the machine-or-transformation test was nonetheless patent eligible because it resulted in "concrete and valuable effects in the field of electronic communications"); *Card*

## 2.    Defendants' "Pen and Paper" Argument

At oral argument, Defendants asserted that the steps of the process could be performed, in at least an analogous fashion, by two people using pen and paper. (Tr. at 23-24; Defendants' Demonstrative Exhibit 1 at 22-24; *see also* Tr. at 19-21, D.I. 9 at 17) In Defendants' posited example, the first person fills out a "Query Form" that mirrors Figure 3 of the patent (steps a-c of the claim) and gives it to the second person; the second person then manually selects items from a table of information and sorts them, based on the request as specified in the Query Form (steps d-e of the claim). (Tr. at 23-24; Defendants' Demonstrative Exhibit 1 at 22-24)

While Defendants' pen and paper analogy has some initial appeal, it is ultimately flawed, and it is does not demonstrate that claim 1 lacks an inventive concept. This proffered pen and paper implementation of the claim is not sufficiently analogous to the claimed invention, because it does not accomplish the goals of the invention or produce its actual effect.

For example, a goal of the invention was to allow a user to perform "contextual data modeling[,]" which involved "[p]erceiving . . . relationships [between objects in a database or spreadsheet] rapidly, and in the context of other data and analytic intentions in the user's mind (including those generated intuitively during the processing)[.]" ('139 patent, col. 2:43-46) The patent sought to enable this technique by speeding up and simplifying the interactions between

---

*Verification Servs. v. Citigroup, Inc.*, 13 C 6339, 2014 WL 4922524, at *5-6 (N.D. Ill. Sept. 29, 2014) (holding that a claim was patent eligible where it resulted in "concrete effects in the field" even if it did not involve "the physical transformation of matter"). Several recent cases have addressed software claims without applying the machine-or-transformation test. *See Alice*, 134 S. Ct. at 2359-60; *Internet Patents*, 2015 WL 3852975 at *4-6; *OIP Techs.*, 2015 WL 3622181 at *3-4; *Content Extraction*, 776 F.3d at 1346-49; *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, — F.3d —, No. 2014-1506, 2015 WL 4068798, at *3-7 (Fed. Cir. July 6, 2015).

the user and the computer. (*Id.*, col. 2:29-52) The pen and paper method set forth by Defendants fails to achieve this goal, because the person who fills out the hypothetical paper form must still wait for another person to manually compile and sort the results of the query set forth on the form. Like the prior art systems described in the '139 patent, "it may take considerable time to produce a table reflecting the changes" resulting from this manual query, and during that time "the user's current line of analytic reasoning may be lost." (*Id.*, col. 1:40-45) This defeats the goal of streamlining the user's interaction with a computer database in order to enable the user to perform contextual data modeling.

Another goal of the invention of claim 1 was to solve the specific problem that prior art database and spreadsheet programs were difficult for users to interact with. Defendants' proffered method performed using pen and paper simply does not address the problem of interacting with computer spreadsheet and database programs.

Yet another goal of the invention is to allow even an inexperienced user to interact with a database program without aid of an instruction manual or extensive computer training, and without the need for a second person to act as a database operator. ('139 patent, cols. 1:15-2:52) Defendants' pen and paper method, however, involves a second person in addition to the user, who essentially acts as the database operator and actually carries out the query. (Tr. at 23-24; Defendants' Demonstrative Exhibit 1 at 22-24)

Thus, although it may be technically correct to say that humans could use a pen and paper to perform a sorting process that is similar in some ways to the process called for by claim 1, it is hard to assert that this would "produce the actual effect of the invention." *California Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 994-95 (C.D. Cal. 2014) (noting that a

"pencil and paper" test is "unhelpful for computer inventions" in that while "[m]any inventions could be theorized with pencil and paper . . . pencil and paper can rarely produce the actual effect of the invention.").

Moreover, Defendants have not cited any case where the Supreme Court or the Federal Circuit have held that a claim is patent ineligible based *solely* on the fact that an analogous method could be performed using pen and paper. In *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005 (Fed. Cir. 2014), for example, the Federal Circuit held that certain claims were directed to a patent ineligible abstract idea under step one of the *Alice* test, where those claims could be "carried out by a human being using a pen and paper" if the computer-related limitations were ignored. 576 F. App'x at 1007-08 (citation omitted). But the *Planet Bingo* Court also found that the claims were otherwise "similar" to the claims at issue in *Bilski* and *Alice*. *Id.* at 1008. The Court further determined that the "patent's recitation of a computer amounts to a mere instruction to 'implemen[t]' an abstract idea 'on . . . a computer[.]'" *Id.* at 1008 (quoting *Alice*, 134 S. Ct. at 2358). Likewise, in *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372-73 (Fed. Cir. 2011), the Court noted that "[a]ll of [the claimed] method steps can be performed in the human mind, or by a human using a pen and paper." But that decision also turned on the fact that the claim was not limited to any particular solution to the problem described in the patent, and that it "extend[ed] to essentially any method of [achieving the objective of the claims,] even methods that can be performed in the human mind." *Id.* at 1372; *see also id.* at 1374-76, 1376 n.4 (noting that, while the claim was addressed to a "method for detecting credit card fraud," "the claims contain no hint as to how the information regarding the Internet transactions will be sorted, weighed, and ultimately converted into a

34

useable conclusion that a particular transaction is fraudulent"). Thus, both *Planet Bingo* and *Cybersource* may be easily distinguished from the situation at hand, where the patentee claimed a specific solution to a prior art problem, using the query dialog box and related limitations.[20]

### 3. Defendants' Argument that the Computer-Related Elements of Claim 1 Are Conventional

Defendants next argue that the computer-related elements of the claims cannot represent an inventive concept because they are "conventional" or "generic," and that they "don't require a substantial and meaningful role for the computer other than simply performing the method on the computer." (Tr. at 24-25, 31-32) In *Alice*, the Supreme Court held that a claim must do more than include a requirement to use "a generic computer to perform generic computer functions[,]" or functions that are "purely conventional." 134 S.Ct. at 2359.

Claim 1 of the '139 patent, read in the light most favorable to Plaintiff, claims more than simply using a generic computer to perform conventional functions. The Court does agree with Defendants that, as described in the specification, the individual elements used to build the claimed features, considered alone, are generic and conventional. (*See, e.g.*, '139 patent, col. 4:65-5:23 (describing the computer system itself), 5:55-59 (explaining that the query dialog box can be built using conventional programming in a Microsoft Windows environment)) But on some level, every invention can be *built* from conventional components. Here, however, there is no support for the idea that the query dialog box itself is a "conventional component." As the

---

[20] The Federal Circuit briefly addressed this issue again in its recent decision in *Intellectual Ventures I LLC*, 2015 WL 4068798 at *4. There, the Court held that "the budgeting calculations at issue here are unpatentable because they 'could still be made using a pencil and paper[.]'" *Id.* (quoting *Cybersource*, 654 F.3d at 1371). But, like the claims in *Planet Bingo* and *Cybersource*, the claims in *Intellectual Ventures* "recit[ed] no more than generic computer elements performing generic computer tasks[.]" *Id.*

35

specification sets forth, spreadsheet and database management programs at the time of invention did not contain a single, unified interface allowing an ordinary user to quickly create queries of the data in a data source. (*Id.*, col. 1:32-45) The inventive concept of the claims is the creation of a specific interface for that purpose. (*Id.*; *see also id.*, col. 2:6-20) This claimed interface, the query dialog box, represents a departure from the conventional operation of computers at the time—despite the fact that the individual elements of the interface are conventional, and the fact that it runs on a generic computer.

In their opening brief, Defendants also cite to *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010) for the proposition that "'[i]n order for the addition of a machine to impose a meaningful limit on the scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, *i.e*, through the utilization of a computer for performing calculations.'" (D.I. 9 at 15) Similar directives have appeared in more recent Federal Circuit cases. *See OIP Techs.*, 2015 WL 3622181 at *3 (stating that "relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible") (citation omitted); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, — F.3d —, No. 2014-1506, 2015 WL 4068798, at *4 (Fed. Cir. July 6, 2015) ("[O]ur precedent is clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract idea.").

However, claim 1 of the '139 patent is not directed simply to using a computer to perform the abstract idea more quickly than could be done without a computer. Instead, it claims a specific interface for allowing a user to more easily (and, to be sure, more quickly) *interact with*

36

*a computer*, in a way preferable to the methods used in the prior art.[21]  In that sense, claim 1 is

really about how to improve the functioning of the computer itself.  *Cf. Alice*, 134 S.Ct. at 2359

(holding that claims were not patent eligible in that the claims did not "improve the functioning

of the computer itself").

### 4.     The Query Dialog Box is Not Extra-Solution Activity

Defendants argue that the query dialog box "amounts to no more than an insignificant

extra-solution activity[.]"  (D.I. 9 at 17)  The Court disagrees.  Far from being "insignificant

extra-solution activity[,]" the query dialog box *is* the solution that the patentee invented, after

being faced with the problems relating to the prior art.

### 5.     Claim 1 Does Not Unduly Preempt the Alleged Abstract Idea

Defendants contend that "although the claims at issue in this case may not preempt all

conceivable ways to sort data . . . the claims nevertheless are so broad, with such generic

computer elements for input, processing, and output, that they do preempt virtually all practical

uses."  (D.I. 13 at 5)  While the claims have some breadth, the Court cannot conclude, on this

record, that they would unduly preempt the application of the abstract idea.  As described in the

specification, prior to the patent, the abstract idea at issue here was practiced using "database

management systems[,]" which allowed a user to display, classify, and organize data in a manner

---

[21]      (D.I. 10 at 14; Tr. at 59-61; *see also, e.g.*, '139 patent, col. 2:8-12 ("[E]xisting
systems and programs for sorting data may not adequately serve the needs of some users,
especially those without specialized training or experience attempting quickly to discern
relationships between and among elements in large sets of data."); *id.*, col. 2:29-33 ("Users of
databases . . . need the ability to relate interactively with the tables to quickly revise the format to
match the rapid and complex probing of the thought process."); *id.*, col. 2:49-52 ("The present
invention permits the use of a computer system rapidly to reformat displays of text data objects in
terms of parameters chosen by the user, without the aid of an instruction manual and without
extensive computer training."))

different than that which is claimed. ('139 patent, cols. 1:15-2:20)

The query dialog box claimed in the '139 patent is an asserted improvement on this prior art process, representing a particular technical solution to a prior art problem.[22] ('139 patent, cols. 1:46-2:52) Prospective inventors can solve the same problem in different ways, such as by using a structure other than a dialog box, or by creating a different user interface in which the user specifies search criteria and sort criteria at separate times or in other ways.[23] *DDR Holdings*, 773 F.3d at 1259.

### 6.    Other Cases Cited by Defendants

At oral argument, Defendants cited *Loyalty Conversion Sys. Corp. v. Am. Airlines, Inc.*, 66 F. Supp. 3d 829, 838-39 (E.D. Tex. 2014) for the proposition that "requiring the use of a graphical user interface, such as a webpage[,] without more" is insufficient to provide an inventive concept. (Tr. at 33-34) The Court in *Loyalty Conversion* dealt with two patents that paralleled each other, which were held to be patent ineligible because they were directed to the abstract idea of "currency exchange, as applied to the exchange of currencies in the form of loyalty award credits of different vendors" (such as frequent flyer miles). *Loyalty Conversion*, 66 F. Supp. 3d at 836-40. The representative claims of the first patent involved a method or

---

[22]    Because the query dialog box is a particular solution to an identified prior art problem, the Court rejects Defendants' argument that the query dialog box serves only to "limit the application of the abstract idea to a narrow particular technological environment[,] a Microsoft Windows desktop computer[.]" (Tr. at 25-26)

[23]    The Court notes that its determination with regard to preemption is contingent here on viewing the claims in the light most favorable to the patentee. In this case, that has resulted in a narrow construction of "query dialog box" that is limited to a "dialog box" as described in the specification. *Cf. Intellectual Ventures*, 2015 WL 4068798 at *6 (holding that an "interactive interface[,]" construed broadly, was insufficient to form an inventive concept).

program to convert credits from one loyalty program to another. *Id.* at 831-33. The second patent was directed to a method involving the use of a "graphical user interface" for the awards program covered by the first patent; that graphical user interface consisted of a web page that would show a quantity of award credits, with an "option to convert" some of those credits to credits for another loyalty program. *Id.* at 833-34. The Court held that the addition of the user interface limitations amounted to "[t]he recitation of the use of the web pages and the Internet," which was "insufficient to avoid a holding of unpatentability." *Id.* at 844 n.6; *see also id.* at 839.

Claim 1 of the '139 patent can be distinguished from graphical-user-interface-related claims at issue in *Loyalty Conversion* in at least two different ways.

First, the *Loyalty Conversion* claims were unspecific. They were directed to a web page that included a display of loyalty award credits and an "option to convert" them—two things that would be needed for any implementation of the underlying abstract idea. *See id.* at 833-34. In contrast, claim 1 of the '139 patent discloses an improved user interface for the creation of a database search query—a process that the patent describes as having been practiced in other ways on computers prior to the invention of the new user interface. ('139 patent, col. 1:32-45) The new user interface was intended to solve a specific problem with prior art interfaces, not to preempt all possible ways of practicing the asserted abstract idea on a computer. (*Id.*, col. 2:49-65; *see also id.* at claim 1)

Second, the claims at issue in *Loyalty Conversion* "d[id] not describe any novel manner of performing that function other than referring to the use of routine operations performed by a specially programmed computer[,]" and the portions of the claims that referred to computer elements "d[id] not include any inventive measure that 'purport[ed] to improve the functioning

39

of the computer itself[.]'" *Loyalty Conversion*, 66 F. Supp. 3d at 845 (quoting *Alice*, 134 S.Ct. at 2359). Claim 1 of the '139 patent does describe such an "inventive measure"—the query dialog box.

For these reasons, the *Loyalty Conversion* opinion does not persuade the Court that claim 1 of the '139 patent lacks an inventive concept.[24]

## F. The Remaining Claims

Defendants' Motions are directed to all 19 claims of the '139 patent. (D.I. 9 at 1) The Court has determined that, construed in the light most favorable to Plaintiff, claim 1 is not directed to the asserted abstract idea, and that, even if it were, the claim plausibly includes an

---

[24] Defendants also cited *Enfish, LLC v. Microsoft Corp.*, 56 F. Supp. 3d 1167 (C.D. Cal. 2014) and *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 56 F. Supp. 3d 813 (E.D. Va. 2014), each of which held that claims involving databases or tabular information were not patent eligible. (Tr. at 21-22, 35) But those cases are distinguishable for the same reasons as is *Loyalty Conversion*. Both of those cases generally involved patents that did not claim any improvement over the prior art other than use of the abstract idea itself, which was implemented in an unspecific manner using conventional techniques. *See Enfish*, 56 F. Supp. 3d at 1179-80; *Amdocs*, 56 F. Supp. 3d at 820, 823, 825.

One portion of *Amdocs* deserves additional analysis. Of the several patents that the *Amdocs* court held were not patent eligible, one involved a "graphical user interface" ("GUI") limitation that is similar in some ways to the query dialog box limitation of the '139 patent. *Amdocs*, 56 F. Supp. 3d at 823-24. The claim required a "graphical user interface" that "list[ed] a plurality of available functions[,]" included a "plurality of fields," and allowed a user to "choose at least one of the listed functions" and "at least one of [the] fields[.]" *Id.* at 823. But the Court in *Amdocs* determined that these elements served only to call for a "conventional" GUI. *Id.* at 824. And the majority of claim elements were directed to an abstract idea that did not relate to any particular user interface. *See id.* As such, the GUI elements in *Amdocs* could be seen as a drafting effort to cover the abstract idea. In contrast, at this stage, claim 1 of the '139 patent must be seen as being directed towards an *improvement* on a conventional user interface, one that amounts to more than a drafting effort to supply patent eligibility to an otherwise patent-ineligible abstract idea. This is evident from the claim, in which the user interface element is specified with some particularity, and from the specification, which focuses on the improved user interface, and makes clear that the asserted abstract idea itself is not new and was performed using a computer in the prior art.

inventive concept sufficient to render it patent eligible. *Alice*, 134 S.Ct. at 2355. Defendants assert that claim 1 is representative of the remaining independent claims, (D.I. 9 at 4-5; D.I. 13 at 9-10), and have not identified any differences in the remaining independent or dependent claims that would render them patent ineligible following a determination that claim 1 is patent eligible. For that reason, the Court need not address the remaining claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that Defendants' Motions be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: July 15, 2015

_____
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE